UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-81019-CIV-CANNON/Reinhart

**LADENBURG THALMANN & CO. INC.**,

    Plaintiff,

v.

**BRIGHT MOUNTAIN MEDIA, INC.**,

    Defendant.
_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon Defendant's Motion for Summary Judgment ("Defendant's Motion") [ECF No. 56], and Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") [ECF No. 60]. The Court has reviewed the motions, the responses in opposition [ECF Nos. 72, 70], the replies in support [ECF Nos. 79, 77], the various statements of facts [ECF Nos. 55, 57, 65, 78, 81], and the full summary judgment record, including Plaintiff's freestanding exhibits [ECF Nos. 67, 69]. For the reasons set forth herein, Plaintiff's Motion [ECF No. 60] is **GRANTED**, and Defendant's Motion [ECF No. 56] is **DENIED**.

### FACTUAL BACKGROUND[1]

The present dispute is governed by the parties' Investment Banking Agreement (the "IBA"), which Plaintiff and Defendant executed on September 1, 2020 [ECF No. 55 ¶ 8; ECF No. 73 ¶ 8]. Plaintiff is an investment bank that provides financial services to clients [ECF No. 55 ¶ 26; ECF No. 73 ¶ 26]; Defendant is a digital media and advertising firm [ECF No. 55 ¶ 7; ECF No. 73 ¶ 7]. Under the IBA, Plaintiff would assist "the Company as its exclusive

---

[1] These facts are undisputed unless otherwise noted.

financial advisor in connection with investment banking matters . . . ." (hereinafter the "exclusivity clause") [ECF No. 1-1 p. 2].[2] "[T]he Company" collectively refers to Defendant and "its subsidiaries, affiliates, beneficiaries, successors, and assigns" [ECF No. 1-1 p. 2]. Paragraph 5(C) of the IBA sets forth Defendant's obligation to pay Plaintiff fees in connection with various investment banking transactions that meet certain criteria [ECF No. 1-1 p. 4]. Paragraph 5(C) states as follows:

> **Fee Obligation**. [Plaintiff] shall be entitled to the fees set forth in this Paragraph 5 with respect to any Transaction consummated during the Term, or within one year after the date of termination or expiration of this Agreement if such Transaction is consummated with a Target or Investor who has signed a nondisclosure agreement with respect to a Transaction or with a Target introduced by [Plaintiff] in writing to the Company and with which the Company had not been in discussions with regarding a Transaction prior to the date of this Agreement.

[ECF No. 1-1 p. 4]. It is disputed whether Defendant's obligation to pay fees is triggered by the investment banking transaction at issue in this case [ECF No. 55 ¶ 20; ECF No. 73 ¶ 20].

The IBA further details the services that Plaintiff can perform and defines the kinds of transactions that would entitle Plaintiff to the above-mentioned fees [ECF No. 65 ¶ 5; ECF No. 78 ¶ 5]. The IBA defines two types of transactions: a "Financing Transaction" and an "M&A Transaction" (collectively a "Transaction") [ECF No. 1-1 p. 2]. For purposes of the IBA, a Financing Transaction includes, among other things, "any debt financing; or any offer or public or private sale of . . . the Company's capital stock" [ECF No. 1-1 p. 2]. An M&A Transaction generally includes "any merger, consolidation, [or] reorganization . . . pursuant to which the Company is acquired by, acquires, [or] is combined with . . . another party" [ECF No. 1-1 p. 2]. In connection with a Transaction under the IBA, Plaintiff can perform "Financing Services" or

---

[2] There is no copy of the IBA in the summary judgment filings specifically, but Plaintiff attached the IBA as an exhibit to its Complaint [ECF No. 1-1], and both parties agree that that copy is true and correct [ECF No. 65 ¶ 3; ECF No. 78 ¶ 3].

2

"M&A Services" as it "deems reasonably necessary" [ECF No. 1-1 p. 3].  Financing Services generally consist of Plaintiff "[u]sing its reasonable efforts in identifying and introducing the Company" to potential investors ("Investors") [ECF No. 1-1 p. 3].  M&A Services consist of Plaintiff "[u]sing its reasonable efforts in identifying and introducing the Company" to prospective acquisition candidates ("Targets") [ECF No. 1-1 p. 4].  Finally, in connection with a Transaction, Plaintiff may be entitled to receive a "Financing Transaction Fee" or an "M&A Transaction Fee" pursuant to a formula set out in the IBA [ECF No. 1-1 p. 4].  Importantly, Plaintiff disputes whether it is actually required to perform Financing Services or M&A Services in connection with a given Transaction for it to be entitled to fees stemming from that Transaction [ECF No. 73 ¶ 18].

One particular transaction forms the basis of the parties' dispute: Defendant's acquisition of three entities formerly known as Engine Group, Inc., Engine International, Inc., and Engine USA, LLC in April 2023 (the "Big Village Acquisition").[3]  This acquisition was effectuated during the Term of the IBA [ECF No. 55-7 (reflecting acquisition date of April 10, 2023)].  The facts surrounding the Big Village Acquisition as contained within the summary judgment record are set forth below.

On June 5, 2020, two non-party entities, Centre Lane Partners Master Credit Fund II, L.P. ("CLP") and CL Media Holdings LLC ("Media Holdings"), entered into an Amended and Restated Senior Secured Credit Agreement (the "Credit Agreement") whereby CLP would lend Media Holdings $16,416,905 for purposes of financing Defendant's acquisition of another non-party entity, Wild Sky Media [ECF No. 55 ¶¶ 33–35; ECF No. 73 ¶¶ 33–35].  On December 23, 2021,

---

[3] In May 2022, Engine Group, Inc., Engine International, Inc., and Engine USA, LLC amended their Delaware certificates of incorporation such that the above-mentioned entities were respectively renamed Big Village Group, Inc., Big Village Insights, Inc., and Big Village Agency LLC [ECF Nos. 55-8, 55-9, 55-10].  These facts are not in dispute, although Plaintiff suggests they are irrelevant [ECF No. 55 ¶¶ 53–55; ECF No. 73 ¶¶ 53–55].

Defendant filed a Form 10-K documenting its financial performance for the 2019 and 2020 fiscal years [ECF No. 55 ¶ 51; ECF No. 73 ¶ 51; ECF No. 55-6 (Form 10-K)].  And on July 23, 2020, CLP members internally circulated a document entitled "Proposal for the Recapitalization of Engine Group" [ECF No. 55 ¶ 56; ECF No. 73 ¶ 56; ECF No. 55-11].  The remaining facts leading up to the Big Village Acquisition are either disputed or not contained in the summary judgment record.[4]

On April 13, 2023, during the IBA term (the "Term"), Defendant filed a Securities and Exchange Commission Form 8-K documenting the Big Village Acquisition [ECF No. 55 ¶ 52; ECF No. 73 ¶ 52; ECF No. 55-7 (April 13, 2023, Form 8-K)].  Presumably through the Form 8-K, Plaintiff learned that Defendant had completed a roughly $20,000,000 acquisition that had been funded by debt financing [ECF No. 65 ¶ 12; ECF No. 78 ¶ 12].  It is undisputed that Defendant did not use a third-party advisor (Plaintiff or otherwise) in connection with the Big Village Acquisition [ECF No. 55 ¶ 42; ECF No. 73 ¶ 42].  Plaintiff thereafter invoiced Defendant for the M&A Transaction Fees and Financing Transaction Fees associated with the Big Village Acquisition pursuant to the IBA [ECF No. 65 ¶ 14; ECF No. 78 ¶ 14].  Defendant refused to pay the invoiced fees, totaling $1,491,273.68, leading to this lawsuit [ECF No. 65 ¶ 15; ECF No. 78 ¶ 15; ECF Nos. 1-4, 1-5].

## PROCEDURAL BACKGROUND

Plaintiff's Complaint lodges a single claim for breach of contract arising from Defendant's alleged failure to pay the applicable fees under the IBA ("Count I") [ECF No. 1].  Defendant raises six affirmative defenses, four of which are implicated by the present motions [ECF No. 7].  Defendant's first and second affirmative defenses assert that Plaintiff is not entitled to fees

---

[4] The Court further explains the deficiencies in the record below.

associated with the Big Village Acquisition under the terms of the IBA [ECF No. 7 pp. 5–7]; Defendant's third and fourth affirmative defenses assert that the IBA is inequitable or void for lack of consideration [ECF No. 7 pp. 7–8]. Following discovery, the parties timely filed their respective motions for summary judgment, which are ripe for adjudication [ECF Nos. 56, 60, 70, 72, 77, 79].

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden to prove the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252. "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (internal quotation marks omitted). Speculation or conjecture cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most

favorable to the non-moving party. *See Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e), (c). In that instance, a non-moving party's failure to produce evidence for an essential element of a claim warrants summary judgment in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

## DISCUSSION

Defendant's Motion seeks summary judgment in Defendant's favor on Plaintiff's claim for breach of contract and, alternatively, on Defendant's first, second, third, and fourth Affirmative Defenses [ECF No. 56]. Plaintiff's Motion requests the grant of summary judgment on its one claim for breach of contract [ECF No. 60]. Resolution of the present motions requires the Court to determine whether the evidence adduced in discovery creates a factual dispute as to whether Plaintiff is entitled to fees associated with the Big Village Acquisition—a transaction which all agree was consummated during the IBA's Term and for which Plaintiff did not perform any specific Financing Transaction Services or M&A Transaction Services.

The Court reaches the following two conclusions in its determination that summary judgment is warranted in Plaintiff's favor. First, even if Defendant's interpretation of Paragraph 5(C) of the IBA is correct and evidence of Defendant's pre-Term discussions with a target or investor regarding the Big Village Acquisition relieves Defendant of any fee obligation to Plaintiff, Defendant has not presented record evidence of any such discussions prior to the Term. Second, contrary to Defendant's argument, the IBA is supported by consideration/mutuality of obligation.

For these reasons, Plaintiff is entitled to judgment as a matter of law on its sole claim for breach of contract under the IBA. The Court reasons below.

> **A.** **Even accepting Defendant's interpretation of the Discussion Exception in Paragraph 5(C), Defendant has not created a factual dispute that Defendant was engaged in discussions with a Target or Investor about Acquiring the Big Village Entities prior to the IBA Term.**

At the threshold of the cross-motions is an interpretive dispute regarding the meaning of Paragraph 5(C) of the IBA. The full text of Paragraph 5(C), which governs Defendant's Fee Obligation, is reproduced again below, with emphasized text applied to the disputed language, referred to here as the "Discussions Exception."

> **Fee Obligation**. [Plaintiff] shall be entitled to the fees set forth in this Paragraph 5 with respect to any Transaction consummated during the Term, or within one year after the date of termination or expiration of this Agreement if such Transaction is consummated with a Target or Investor who has signed a nondisclosure agreement with respect to a Transaction or with a Target introduced by [Plaintiff] in writing to the Company *and with which the Company had not been in discussions with regarding a Transaction prior to the date of this Agreement*.

[ECF No. 1-1 p. 4 (emphasis added)].

On its face, Paragraph 5(C) identifies two timeframes in which a "Transaction" can take place: (1) one "consummated during the Term," as happened here, or (2) one consummated "within one year after the date of termination or expiration of this Agreement" (the "Tail") [ECF No. 1-1 p. 4]. Paragraph 5(C) then goes on to include a lengthy "if" clause with specific criteria, including the signing of a nondisclosure agreement; a written introduction by Plaintiff; and discussions between Defendant and a target prior to the effective date of the IBA.

The parties focus their briefing on the application of the last condition, the Discussions Exception. According to Plaintiff, that exception to payment is limited to transactions consummated during the Tail period, making any evaluation of such discussions irrelevant here because all agree that the Big Village Acquisition was consummated during the Term [ECF No.

72 pp. 5–7].[5] This reading is compelled by the grammatical structure of Paragraph 5(C), Plaintiff argues, because the comma and the conjunction "or"—which separate the Term and Tail clauses—operate to limit the backwards reach of the Discussions Exception to transactions consummated only during the Tail period. Defendant disagrees, countering that the Discussions Exception applies to both the Term and Tail periods [ECF No. 79 pp. 2–6]. Helpful to this view, Defendant observes, is the phrase "if such Transaction" preceding the list of specific criteria, which refers back to the use of the word "Transaction" in the clause describing the Term period [ECF No. 79 pp. 2–6].

Although the parties raise plausible textual arguments about the application of the Discussions Exception, the Court need not definitively resolve the interpretive dispute because, even accepting Defendant's view that evidence of pre-Term discussions would excuse any fee obligation for a transaction consummated during the Term, Defendant has not raised a triable fact issue that it was in discussions with a Target or Investor regarding the acquisition of the Big Village entities prior to the date of the IBA.[6] Defendant refers to four items in this regard: the Credit Agreement [ECF No. 55-3]; the document circulated internally at CLP titled "Proposal for the Recapitalization of Engine Group" on July 23, 2023 [ECF No. 55-11]; an SEC Form 10-K for the 2019 and 2020 fiscal years (the "Annual Report") [ECF No. 55-6]; and an SEC Form 8-K filed on June 5, 2020 (the "June 2020 Form 8-K") [ECF No. 56 pp. 6–7; ECF No. 79 pp. 8–11]. None of this proffered evidence creates a factual dispute that Defendant was in discussions regarding the

---

[5] The Big Village Acquisition was consummated on April 13, 2023, during the IBA Term [ECF No. 1-1 (Effective date of IBA September 1, 2020); ECF No. 55 ¶ 52; ECF No. 73 ¶ 52; ECF No. 55-7 (April 13, 2023, SEC Form 8-K)].

[6] The Big Village Entities consist of Big Village Group, Inc., Big Village Insights, Inc., Big Village Agency LLC.

Big Village Acquisition prior to the IBA Term.

First, to the extent that Defendant relies on the June 2020 Form 8-K as evidence that it was engaged in discussions with non-party CLP about "a Transaction" as early as June 2020 [ECF No. 56 pp. 6–7], that document is not contained in the summary judgment record, and the Court is not obligated to go searching for it [*see* ECF No. 55-1 through 55-11].[7] *Celotex*, 477 U.S. at 322 ("[T]he party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."). In any event, even taking at face value Defendant's representations in its Motion about the contents of the June 2020 Form 8K—that Defendant and non-party CLP entered into a "membership interest purchase agreement" and that Defendant issued 2.5 million shares of restricted common stock to CLP [ECF No. 56 p. 6]—neither fact is sufficient to create a genuine factual dispute that Defendant was engaged in pre-Term discussions with a Target or Investor *regarding the Big Village Acquisition*, which is what matters here.[8] Defendant fails to point to evidence establishing that entering into an agreement with non-party CLP, or issuing shares to non-party CLP, amounts to "discussions" regarding Defendant's acquisition of the Big Village entities.

Second, to the extent that Defendant refers to the Annual Report as evidence that CLP was

---

[7] Exhibit E to Defendant's Statement of Material Fact is labeled as "June 5, 2020 Bright Mountain Media, Inc. United States Securities and Exchange Commission Form 8-K," but, following review, Exhibit E is actually an SEC Form 8-K filed on April 10, 2023, and is a duplicate of Exhibit G to Defendant's Statement of Material Fact [ECF Nos. 55-5, 55-7]. As filed, Exhibit E does not mention the execution of a "membership interest purchase agreement," Defendant's issuance of 2.5 million shares of restricted common stock, or any of the pre-Term financing or "discussions" Defendant claims to have occurred in its Motion [ECF No. 56 pp. 6–7].

[8] The publicly available June 2020 Form 8-K does not reference any of the Big Village entities, whether referred to by their current or prior names (Engine Group, Inc., Engine International, Inc., and Engine USA, LLC).

9

in discussions with a Target or Investor regarding the Big Village Acquisition [ECF No. 56 pp. 7–8], the Annual Report is a one-hundred fifty seven (157) page document to which Defendant provides no pinpoint citations of any kind, opting instead for a general citation to the entire unsearchable PDF [ECF No. 55-6; ECF No. 56 p. 8; ECF No. 79 p. 9]. This is clearly in violation of this Court's Order and the Local Rules, both of which require specific pinpoint citations to particular portions of record material, including references to page and line numbers [ECF No. 12 pp. 4–5 ("It is imperative that each fact in a Statement of Material Facts . . . be accompanied by a particularized pinpoint citation to material in the record")]. *See* S.D. Fla. L.R. 56.1(b)(1)(B) (requiring pinpoint citation to the record where a material fact requires evidentiary support). No more discussion is warranted about this document, although it bears noting that the publicly available (and searchable) version of the Annual Report does not reference the Big Village entities or the document titled "Key Terms of Second Lien Term Loan A," in which Defendant maintains the terms of a proposed transaction between CLP and Big Village entities were memorialized.[9]

This leaves two remaining pieces of record evidence related to Defendant's pre-Term discussions of the Big Village Acquisition: the Credit Agreement executed on June 5, 2020 [ECF No. 55-3], and the document circulated internally at CLP titled "Proposal for the Recapitalization of Engine Group" on July 23, 2020 [ECF No. 55-11]. Both documents *are* contained in the summary judgment record, but neither is sufficient to create a genuine issue of

---

[9] Defendant argues that there is evidence contained in the Annual Report showing that CLP engaged in pre-Term discussions with the Targets of the Big Village Acquisition [ECF No. 56 pp. 7–8]. Defendant also argues, more generally, that CLP is its "affiliate" under the IBA, thus making CLP's discussions tantamount to its own [ECF No. 56 pp. 5–6]. For the reasons discussed above, Defendant has not provided record evidence in the Annual Report of the existence of pre-Term discussions, whether those discussions were engaged in by Defendant itself or CLP. Accordingly, whether or not CLP qualifies as Defendant's "affiliate" under the IBA is irrelevant to the resolution of the present Motions absent record evidence that CLP, or Defendant, engaged in pre-Term discussions with an Investor or Target regarding the Big Village Acquisition.

material fact that Defendant was engaged in discussions related to the Big Village Acquisition prior to the Term.

Starting with the Credit Agreement, this document shows only that CLP loaned Media Holdings $16,416,905 for purposes of financing Defendant's acquisition of another non-party entity, Wild Sky Media [ECF No. 55-3; ECF No. 55 ¶¶ 33–35; ECF No. 73 ¶¶ 33–35]. The parties agree that CLP provided Defendant financing for its acquisition of Wild Sky Media [ECF No. 55 ¶¶ 33–35; ECF No. 73 ¶¶ 33–35]. Beyond that, neither the Credit Agreement nor the Statements of Material Fact draws a connection between Defendant's acquisition of Wild Sky Media or the accompanying $16,416,905 loan and any pre-Term discussions by Defendant with a Target or Investor associated with the Big Village Acquisition [ECF No. 55; ECF No. 55-3]. Notably, the Credit Agreement in no way refers to the Big Village Acquisition [ECF No. 55-3]. Simply put, the fact that Defendant obtained a loan from CLP in June 2020 for purposes of acquiring Wild Sky does not create a factual dispute over the existence of pre-Term discussions related to the Big Village Acquisition, even assuming that Defendant used the same funds obtained through the Credit Agreement to ultimately acquire the Big Village entities in April 2023.

Similarly, the fact that CLP partners internally circulated a document entitled "Proposal for the Recapitalization of Engine Group" says nothing about whether Defendant was involved in discussions to acquire the Targets of the Big Village Acquisition [ECF No. 55-11]. This exhibit—which is heavily redacted—fails to explain how Defendant was involved in pre-Term discussions regarding the Big Village Acquisition or how the "Proposal for the Recapitalization of Engine Group" factored into Defendant's final decision to acquire the Big Village entities [ECF No. 55-11].

Based on the foregoing, Plaintiff is correct in its assertion that Defendant has not put

forward any record evidence creating a genuine factual dispute that Defendant was engaged in discussions related to the Big Village Acquisition before September 1, 2020. Indeed, whether Defendant discussed acquiring the Big Village entities prior to the Term is a fact that Defendant could have shown through any number of evidentiary means. Yet for all of the various attachments Defendant attaches to this docket, none actually show the existence of any discussions related to the Big Village Acquisition, and all essentially obfuscate the matter. In the end, absent any record evidence sufficient to trigger the Discussions Exception in Paragraph 5(C)—and even accepting Defendant's interpretation of Paragraph 5(C)—it is clear as a matter of law that Plaintiff is entitled to fees for the Big Village Acquisition consummated during the Term. Likewise, Defendant's first Affirmative Defense (Failure to State a Claim), to the extent it is rooted in the applicability of the Discussions Exception, fails as a matter of law [ECF No. 7].[10] For these reasons, Plaintiff's Motion for summary judgment on Count I is granted, and Defendant's Motion on that same subject is denied.

> B. **Plaintiff is not required to perform Services related to the Big Village Acquisition to be entitled to fees under the IBA, and the IBA is not void for lack of consideration.**

As noted previously, the IBA defines two categories of services that Plaintiff can perform in connection with a given Transaction: Financing Services and M&A Services (collectively "Services") [ECF No. 1-1 p. 3]. Under the IBA, Plaintiff was retained by Defendant as Defendant's "exclusive advisor in connection with investment banking matters," and Plaintiff may perform the aforementioned Services "as it deems reasonably necessary" [ECF No. 1-1 pp. 2–3].

---

[10] Affirmative defenses based on a "failure to state a claim" are not valid affirmative defenses, *see, e.g.*, *Boldstar Tech. LLC v. Home Depot, Inc.*, 517 F. Supp. 2d 1283, 1292 (S.D. Fla. 2007), but the Court addresses them nevertheless here for completeness in light of Defendant's arguments on summary judgment.

12

There is no dispute that Defendant did not use a third-party investment banking advisor (including Plaintiff) in connection with the Big Village Acquisition [ECF No. 55 ¶ 42; ECF No. 73 ¶ 42].

Defendant argues that Plaintiff is not entitled to fees associated with the Big Village Acquisition because Plaintiff did not provide any Services in connection with that Transaction; Plaintiff did not, for example, introduce or identify any Investor or Target to Defendant associated with the Big Village Acquisition [ECF No. 70 pp. 11–14]. For its part, Plaintiff relies on the exclusivity clause in the IBA, arguing that there is no requirement that Plaintiff provide Services in connection with a particular Transaction to be entitled to fees. In other words, Plaintiff says, the IBA Fee Obligation provision in Paragraph 5(C) is structured in such a way that it does not compensate Plaintiff based on a particular project but rather on the overall Services rendered pursuant to the contract [ECF No. 60 pp. 6–7; ECF No. 72 pp. 10–12]. In response, Defendant argues that, if the Court were to accept Plaintiff's proffered interpretation, the IBA would be void for lack of consideration because Plaintiff could, in theory, do nothing and still claim an entitlement to fees [ECF No. 70 pp. 15–17].

The Court begins with the plain language of the IBA. Following review, there is no express requirement under the IBA that Plaintiff, to be entitled to fees, must perform Services in connection with a particular Transaction. The Fee Obligation provision in Paragraph 5(C) is clear that Plaintiff "shall be entitled to fees . . . with respect to any Transaction consummated during the Term," without conditioning such fees on the performance of particular services [ECF No. 1-1 p. 4]. Likewise, Paragraphs 5(A) and 5(B), which describe Financing and M&A Fees, state, without qualification, that "[i]f the Company consummates a [Transaction], the Company shall pay [Plaintiff] a fee" [ECF No. 1-1 p. 4]. Finally, Plaintiff is authorized under the IBA to provide Services "as it deems reasonably necessary" on a particular Transaction in its advisory role

13

[ECF No. 1-1 p. 3]. Nothing in the contract expressly conditions Plaintiff's entitlement to fees on it performing Services on a particular project. Rather, what matters under the IBA for Plaintiff's entitlement to fees is whether a Transaction is ultimately consummated by "the Company," assuming no exception to payment applies [*see* ECF No. 1-1].[11]

This interpretation of the IBA does not, as Defendant contends, render the contract void for lack of consideration [ECF No. 70 pp. 15–17]. Consideration may consist of either a benefit to the promisor or a detriment to the promisee. *Bayshore Royal Co. v. Doran Jason Co.*, 480 So. 2d 651, 656 (Fla. Dist. Ct. App. 1985). Absent fraud, the adequacy of consideration is not for judicial scrutiny. *See Sharrow v. Dania*, 180 So. 18, 21 (Fla. 1938); *Contractors Constr. Corp. v. Michael Dev. Corp.*, 213 So. 2d 430, 433 (Fla. Dist. Ct. App. 1968) ("The mere fact that the consideration is inadequate does not render a contract nudum pactum, for it is not essential that the consideration be adequate in point of value, since the law cannot decide upon this matter."). "[A] promise, no matter how slight, can constitute sufficient consideration so long as a party agrees to do something that they are not bound to do." *Diaz v. Rood*, 851 So. 2d 843, 846 (Fla. Dist. Ct. App. 2003).

Under the IBA, Defendant promised to use Plaintiff as its exclusive advisor in all matters investment-banking related and to compensate Plaintiff with fees from Transactions consummated during the Term [ECF No. 1-1]. In exchange, Plaintiff promised to "use its reasonable efforts" to introduce Defendant to potential Investors and Targets, assist in negotiations or discussions related to a Transaction, and provide guidance with respect any Transaction "as appropriate" [ECF No. 1-

---

[11] Defendant also relies on the following language in Paragraph 5: "In consideration of the services described above, [Plaintiff] shall be entitled to receive [fees]" [ECF No. 56 p. 11; ECF No. 70 p. 13]. That language does not condition Plaintiff's entitlement to fees on its performance of Services associated with a particular Transaction.

14

1 p. 3]. Plaintiff further promised to "render advice relating to capital structure, enhancing shareholder value and allocation of corporate assets" [ECF No. 1-1 p. 2]. These simply are not promises which are "so insubstantial as to impose no obligation at all," notwithstanding the fact that Plaintiff did not perform any Services with respect to the Big Village Acquisition specifically. *Johnson Enters. of Jacksonville v. Fpl Grp.*, 162 F.3d 1290, 1311 (11th Cir. 1998). Nor does the discretionary, case-by-case nature of Plaintiff's obligation to perform Services render its promise illusory. *Dep't of Revenue v. GM LLC*, 104 So. 3d 1191, 1198 (Fla. Dist. Ct. App. 2012); *see Larsen v. CitiBank, FSB*, 871 F.3d 1295, 1321 (11th Cir. 2017). Under the IBA, Plaintiff must "[u]se reasonable efforts" and provide "appropriate" Services "as it deems reasonably necessary" to effectuate the ultimate goal of consummating Transactions on behalf of Defendant [ECF No. 1-1]. Thus, Plaintiff's obligation to proceed in good faith to assist Defendant in consummating Transactions is neither unfettered nor absolute.[12] [13]

For these reasons, under the plain language of the IBA, Plaintiff is not required to perform specific Services in connection with the Big Village Acquisition to be entitled to fees from it. Defendant's first and second Affirmative Defenses thus fail as a matter of law [ECF No. 7 p. 7 (raising defenses premised on the absence of breach due to Plaintiff's non-performance of Services); ECF No. 56]. Similarly, because the IBA is supported by consideration, Defendant's

---

[12] While the parties disagree on the reasons that other Transactions during the parties' relationship were never consummated, they do not dispute that Plaintiff has performed Services in connection with other Transactions other than the Big Village Acquisition [ECF No. 55 ¶¶ 29–30; ECF No. 73 ¶¶ 29–30; ECF No. 60 p. 10 (describing the "due diligence" Plaintiff performed on other Transactions)].

[13] The Court's conclusion that Plaintiff is not required to perform services in connection with a particular transaction under the plain terms of the IBA is sufficient to resolve Defendant's argument that there was no Financing Transaction because Plaintiff did not introduce Defendant to CLP [ECF No. 56 pp. 9–10]

third and fourth Affirmative Defenses fail as a matter of law [ECF No. 7 pp. 7–8 (defenses challenging IBA as inequitable and void for lack of consideration); ECF No. 56]. Defendant's Motion for Summary Judgment on Plaintiff's Count I is denied.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment [ECF No. 56] is **DENIED**.

2. Plaintiff's Motion for Summary Judgment [ECF No. 60] is **GRANTED**.

3. The pending *Daubert* Motions [ECF Nos. 54, 61] are **DENIED AS MOOT**.

4. All deadlines are **TERMINATED**, including the pre-trial filings deadline [ECF No. 88], and all hearings are **CANCELLED**, including trial and calendar call.

5. Final judgment to be entered separately.[14]

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida this 22nd day of November 2024.

AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

cc: counsel of record

---

[14] This Order fully disposes of Plaintiff's sole claim in this action, Count I for breach of contract [ECF No. 1].